FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Liquidating Agent for
Boston Trade Bank, Plaintiff, Appellee,

v.

Carmen W. ELIO and Elaine J. Elio, Indi-
vidually, as Trustee of the Elio Family
Trust and as Trustee of the Seaview
Realty Trust, etc., et al., Defendants, Ap-
pellants.

No. 94–1248.

United States Court of Appeals,
First Circuit.

Heard June 7, 1994.

Decided Nov. 10, 1994.

Stephen F. Gordon, with whom Stanley W. Wheatley and Gordon & Wise, Boston, MA, were on brief, for appellants.

Jonathan W. Fitch, with whom Andrea Peraner–Sweet, Sally & Fitch, Boston, MA, Ann S. Duross, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, and Jeannette E. Roach, Counsel, Washington, DC, for appellee F.D.I.C.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and CARTER,* District Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

This is an interlocutory appeal from a district court order granting a preliminary in-

* Of the District of Maine, sitting by designation.

junction, granting an attachment, and appointing a trustee pursuant to 12 U.S.C. § 1821(d)(18) and (19).[1]

I. *Background*

Plaintiff is the Federal Deposit Insurance Corp. ("F.D.I.C."), suing in its capacity as liquidating agent for two banks, Boston Trade Bank and First Service Bank for Savings ("First Service").[2] Defendants include Carmen Elio, his wife Elaine Elio individually and in her capacity as trustee, and their daughter Teresa Elio in her capacity as trustee, as well as various entities with which the Elios are involved: the Elio Family Trust, the Seaview Realty Trust, Faneuil Hall Securities, Inc. ("FH Securities"), Faneuil Hall Financial Services, Inc. ("FH Financial Services"), and Faneuil Hall Capital Group, Inc. ("FH Capital Group").

Central to this case are a number of promissory notes executed by Carmen Elio on which he subsequently defaulted, and transfers made by Carmen Elio which the F.D.I.C. alleges were made with intent to hinder, defraud or delay his creditors.

A. *Promissory Notes*

In 1988, Carmen Elio borrowed the following sums from First Service: (1) $400,000 on April 19 by means of an unsecured promissory note with a term of three months; (2) $2 million on May 4 by means of an unsecured promissory note with a term of three years; and (3) $1,450,000 on September 30 by means of a promissory note with a term of three years. Elio defaulted on all three loans.

On July 1, 1991, Carmen Elio and FH Financial Services executed a note for $564,619.35 from the F.D.I.C., which had been appointed liquidating agent of First Service in 1989. The amount represented the outstanding balance on a 1987 loan from First Service to Carmen and Elaine Elio, secured by a mortgage on their home. The F.D.I.C. canceled the predecessor note and discharged the mortgage. Under the new loan agreement, Carmen Elio and FH Financial Services were to make monthly payments of $7,065.38 beginning in August, 1991. Elio defaulted on the monthly payments, and the F.D.I.C. made a demand under the terms of the loan agreement.

By September 1991, Carmen Elio was also in default on obligations to Boston Trade Bank, and, according to a verified complaint filed in another action, to Chase Manhattan Bank for $1,850,000.

B. *Transfers*

On October 25, 1990, Carmen Elio transferred his interest in residential property in Florida to Elaine and Teresa Elio, as trustees of the Seaview Realty Trust, for no consideration. At the time the equity in the property was estimated to be more than $1 million.

On December 31, 1990, Carmen Elio created the Elio Family Trust, naming Elaine Elio as trustee and his children as beneficiaries. Upon creating the trust, Elio transferred approximately one-half of his interest in FH Securities to the trust. Two days later, on January 2, 1991, Elio transferred the rest of his interest in FH Securities to the trust. Elio had valued his total interest in FH Securities at $843,000.

Also on January 2, 1991, Carmen Elio assigned his interest, direct or indirect, in Advantage Health Care Corp. to the Family Trust. On a financial statement dated July 15, 1990, he had stated the value of his interest in Advantage at $3.84 million.[3]

---

1. We shall assume without deciding, the issue having neither been raised nor argued, that an interlocutory order appointing a trustee is appealable under 28 U.S.C. § 1292(a)(2), which provides for appellate jurisdiction over "[i]nterlocutory orders appointing receivers."

2. The F.D.I.C. was appointed liquidating agent of First Service on March 31, 1989, and of Boston Trade Bank on May 3, 1991.

3. Financial statements signed by Carmen Elio in 1989 and 1990 list a six percent interest in Advantage Health Corp. valued at $3,840,000. Elio contends that he never owned any stock in Advantage, but rather was one of two equal partners in H.R. Company, which purchased Advantage stock with money supplied in part by Elio. Elio claims that on January 2, 1991, he assigned his interest in H.R. Company to the Elio Family Trust, that H.R. Company was subsequently dissolved, and that a portion of the Advantage shares were transferred to a nominee for the trust.

In September 1991, Carmen Elio transferred $218,867 to Elaine Elio for no consideration. The F.D.I.C. also offered evidence that the Elio Family Trust had paid Chase Manhattan Bank $104,000 on Carmen Elio's obligations, and had paid $260,000 directly to Carmen Elio.

## C. *Proceedings below*

The F.D.I.C. initiated a total of three actions against defendants. In the first, commenced December 11, 1991 ("*Elio I*"), the F.D.I.C., as liquidating agent of Boston Trade Bank, sought to recover from Carmen Elio and FH Capital Group money owed under certain promissory notes and guaranties. The district court granted the F.D.I.C.'s unopposed motion for summary judgment in *Elio I* and entered final judgment against Carmen Elio for $1,257,730.67 and against FH Capital Group for $59,582.43 on February 2, 1993.

In the second action, commenced August 27, 1993 ("*Elio II*"), the F.D.I.C., as liquidating agent for First Service, sued Carmen Elio and FH Financial Services on the three 1988 promissory notes. The F.D.I.C. later amended this complaint, adding a claim against Carmen Elio on the 1991 note, and adding fraudulent transfer claims against Elaine Elio, both individually and as trustee of the Elio Family Trust and the Seaview Realty Trust, against Teresa Elio as trustee of the Seaview Realty Trust, and against FH Securities.

The third action, commenced December 9, 1993 ("*Elio III*"), is an action on the judgment in *Elio I*, asserting the same fraudulent transfer claims as *Elio II*.

The F.D.I.C. moved in both *Elio II* and *Elio III* for (1) a preliminary injunction against Carmen Elio and anyone acting on his behalf, (2) an attachment on the real property of Carmen and/or Elaine Elio, and (3) appointment of a trustee to hold the assets of the Elio Family Trust and the Seaview Realty Trust. The F.D.I.C. also moved to consolidate the three cases.

After holding a hearing on December 21 and 23, 1993, the district court found that the F.D.I.C. had already proven its right to recover approximately $1.3 million by virtue of its judgment in *Elio I*, and was likely to

achieve judgment in excess of $4,780,000 in *Elio II*. The court found that the F.D.I.C. was reasonably likely to succeed in proving that Carmen Elio had transferred assets to hinder, delay and defraud the F.D.I.C. The court also found that the balance of hardships weighed in favor of granting the equitable relief sought by the F.D.I.C., and that the public interest would be served by granting that relief. The court granted a preliminary injunction against defendants and those acting in concert with them; granted an attachment in the amount of $5 million against property held by Carmen and/or Elaine Elio in Barnstable County, Massachusetts; and appointed a trustee for the Elio Family Trust and the Seaview Realty Trust. The court allowed Carmen and Elaine Elio to pay their ordinary personal expenses up to $5,000 per month, and allowed FH Securities and FH Financial Services, with the trustee's approval, to make payments as reasonably necessary to continue to conduct business.

At a further hearing held on February 3, 1994 to address additional issues relating to the court's order, the court extended the appointment of the trustee to FH Financial Services.

## II. *Analysis*

### A. *Appointment of the trustee*

Defendants argue that the district court abused its discretion by appointing a trustee to hold the assets of the Elio Family Trust, the Seaview Realty Trust and FH Financial Services. In determining whether the district court abused its discretion, "[a]n appellate court's role is to decide whether the district court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 229 (1st Cir.1976).

#### 1. *Applicable standard*

Defendants' contend that the district court failed to apply the proper standard in appointing the trustee. Paragraph (18) of 12 U.S.C. § 1821(d), entitled "Attachment of assets and other injunctive relief," provides:

Subject of [sic] paragraph (19), any court of competent jurisdiction may, at the request of—

    (A) the [Federal Deposit Insurance] Corporation, (in the Corporation's capacity as conservator or receiver for any insured depository institution or in the Corporation's corporate capacity with respect to any asset acquired or liability assumed by the Corporation under section 1821, 1822, or 1823 of this title); ...

    issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure, including an order placing the assets of any person designated by the Corporation or such conservator under the control of the court and appointing a trustee to hold such assets.

Paragraph (19), entitled "Standards," provides in relevant part:

(A) Showing

Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under paragraph (18) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

■ Defendants argue that, despite the statute's references to Rule 65, which governs injunctions, the appointment of a trustee to hold assets is governed by stricter standards and precedents applicable to the appointment of receivers under Rule 66. *See Consolidated Rail Corp. v. Fore River Ry. Co.,* 861 F.2d 322, 326–27 (1st Cir.1988) (reciting factors to be considered in appointment of receivers). This is so, defendant argues, for three reasons: (1) there is no material difference between the trustee authorized by § 1821(d)(18) and a "receiver" as described in Rule 66; (2) the provisions of 28 U.S.C. § 959, which concern the responsibilities and liability of receivers and trustees, do not distinguish between the two; and (3) the apparent intent of paragraphs (18) and (19) is to retain the pre-existing legal standards applicable to such equitable relief except for the requirement that the injury, loss or damage be irreparable or immediate. In making no mention of Rule 66, defendant concludes, the "drafters evidently overlooked the fact" that receivers are governed by Rule 66, not Rule 65.

We do not agree. The fact that a trustee is analogous to a receiver would not prevent Congress from authorizing the appointment of a trustee upon a lesser showing. The statute could not be clearer in its repeated designation of Rule 65 as the source of the governing standard. "[T]he task of interpretation begins with the text of the statute itself, and statutory language must be accorded its ordinary meaning." *Telematics Int'l, Inc. v. NEMLC Leasing Corp.,* 967 F.2d 703, 706 (1st Cir.1992).

Even looking at the statutory history, as courts have sometimes done when interpreting otherwise clear statutory language, *id.,* that history only militates against defendant's argument. Paragraphs (18) and (19) were enacted in 1990 as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act, passed by Congress in response to the crisis in the nation's depository institutions. The Act

responds to the public outcry to put to justice those who defrauded the savings and loan industry by providing Federal regulating agencies, Federal prosecutors, and law enforcement agencies with additional tools to combat fraud and abuse affecting financial institutions.... is aimed at protecting assets from wrongful disposition, expands the authority of the Attorney General, conservators, receivers or liquidating agents and Federal banking agencies to enjoin the dissipation of assets wrongfully obtained.... [and] further expands the power of conservators, receivers or liquidating agents to avoid fraudulent transfers....

136 Cong.Rec. E3684 (daily ed. Nov. 2, 1990) (statement of Rep. Schumer). "By enacting the Taxpayers Recovery Act, Congress has evidenced its desire to take an aggressive position in minimizing losses sustained by taxpayers due to bank failures.... Congress has given the FDIC a green light to use aggressive tactics in protecting taxpayers' interests." *F.D.I.C. v. Cafritz,* 762 F.Supp. 1503, 1509 (D.D.C.1991). *See also Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1200 (10th Cir.1992) ("Congress clearly intended to reduce the RTC's burden—vis a vis other litigants in similar situations—when

it seeks to freeze assets that allegedly are the subject of a fraudulently [sic] conveyance."). Providing for the appointment of a trustee under the standards of Rule 65 fits within this purpose. Where a statute's plain language was consonant with its apparent purpose, we have said that we would not find in it a meaning "nowhere suggested by the explicit language of the statute itself." *Telematics,* 967 F.2d at 706–07.

■■■■■ We conclude that the appointment of a trustee under 12 U.S.C. § 1821(d)(18) is governed by the standards and precedents applicable to the issuance of injunctive relief under Rule 65, except that there is no need for plaintiff to show that the injury, loss or damage will be irreparable or immediate. To justify the appointment of a trustee to hold the assets of defendants, the F.D.I.C. was, therefore, required to show (1) that it will suffer some injury in the absence of the appointment of a trustee; (2) that such injury outweighs any harm which appointment of the trustee would inflict on the defendant; (3) that the F.D.I.C. has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the appointment of the trustee. *See Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).[4]

### 2. *Reasonableness of the court's factual findings*

Defendants argue that there was no reasonable support for the district court's conclusions that (1) the F.D.I.C. was likely to succeed on the merits of its claims, (2) the F.D.I.C. would suffer harm in the absence of the appointment of the trustee, and (3) the balance of harms favored the F.D.I.C.[5]

### a. *Likelihood of success on the merits*

The F.D.I.C. brings its claims against the Elio Family Trust and the Seaview Realty Trust to avoid fraudulent transfers under 12 U.S.C. § 1821(d)(17). To succeed on such claims, the F.D.I.C. must show that the transfer was made by the debtor of the financial institution within five years of the F.D.I.C.'s appointment as conservator or receiver, and that that debtor "voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency." 12 U.S.C. § 1821(d)(17)(A).

Because direct evidence of fraudulent intent is often lacking, courts may have to rely on inferences "from the circumstances surrounding a transaction, placing particular emphasis on certain indicia or badges of fraud." *F.D.I.C. v. Anchor Properties,* 13 F.3d 27, 32 (1st Cir.1993). Such indicia may commonly include, without limitation,

(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer.

*Id.* "[T]he confluence of several [indicia or badges of fraud] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1253–54 (1st Cir.1991).

---

4. The F.D.I.C. ignores the first of these four prongs—that some showing of harm be made—in the formulation argued to us. Perhaps it feels that such a requirement is implicit in the second prong, that the balance of harms supports the party requesting relief. We agree with the Tenth Circuit, in any case, that 12 U.S.C. § 1821(d)(19) does not completely eliminate the requirement that "some showing of injury" be made. *Cruce,* 972 F.2d at 1200. *See also* 136 Cong.Rec. E3686 (statement of Rep. Schumer) (daily ed., Nov. 2, 1990) ("Congress still intends that the Corpora-

tion be required to make some showing of injury prior to obtaining relief"). *But see Cafritz,* 762 F.Supp. at 1505–06.

5. Defendants also argue that, under the standards and precedents governing the appointment of receivers under Rule 66, the F.D.I.C. was required to show that it had a legal or equitable right in the defendants' property, and that it failed to do so here. Because we hold that those standards do not apply, we do not address this argument.

■ Here, the evidence amply supported the district court's finding that the F.D.I.C. was likely to succeed on the merits of its fraudulent transfer claims against the Elio Family Trust and the Seaview Realty Trust. The transfers were made in late 1990 and 1991. The evidence indicated that by the end of 1990, Carmen Elio was more than $6 million in debt, of which approximately $4.5 million was in default, and that by September 1991 he was also in default on obligations to Boston Trade Bank. There was evidence that these debts remained in default, with interest accruing, and that judgment subsequently entered for $1,257,730.67 on the F.D.I.C.'s action as liquidating agent of Boston Trade Bank. The district court could thus reasonably have found unmanageable indebtedness on Elio's part at the time of the transfers, and could reasonably have inferred that Elio would have been aware that litigation would inevitably follow.

It is unquestioned that the transferees had a special relationship with Carmen Elio. The two trusts were both created by Elio; family members served as the trustees of both; his children were the beneficiaries of the Elio Family Trust.[6] Nor do defendants dispute that the transfers were made for no consideration.

■ The court supportably found that the transfers to the trusts were not for legitimate tax planning purposes. Michael Davis, the tax attorney who had prepared the instruments establishing the Elio Family Trust, testified that, although he understood that the trust was being established for tax purposes and was aware of the initial transfer of approximately half of the FH Securities stock to the trust, Carmen Elio did not inform him of the transfer of the remaining stock only two days later. Davis also testified that he was not consulted on or aware of any subsequent transfers to the trust. His testimony also indicated that the stock transfers far exceeded the amount that would have been exempt under the gift tax annual

exclusion. Davis speculated that the additional amount could have had other beneficial tax consequences, but conceded that the financial information provided to him by Carmen Elio was insufficient for him to know whether beneficial consequences would occur. Davis testified that he did not recall having seen Elio's 1989 or 1990 tax returns, was unaware to what extent Elio had made any prior gifts that would affect the level of his lifetime gift tax exemption, was not consulted with respect to payment of any gift tax on the transfers to the trust, and was unaware of Elio's transfer of property to the Seaview Realty Trust. The district court reasonably concluded that although counsel formed the trust for conventional gift tax purposes, Carmen Elio had not provided counsel with full and accurate financial information and immediately used the trust as a means to hinder, delay and defraud his creditors.

■ The record supports the finding that Carmen Elio continued to enjoy the benefits of the property even after the transfers were made. There was evidence that the Elio Family Trust made payments on Elio's obligation to Chase Manhattan Bank, and that the trust paid $260,000 directly to Elio;[7] there was also evidence that, even after the Florida property was transferred to the Seaview Realty Trust, Elaine Elio stated that the property was her "winter residence," from which the court reasonably inferred that Carmen Elio had use of the property as well.

■ The record supports the district court's finding that Carmen Elio had in the past made false statements regarding his financial condition. His financial statement given to Chase Manhattan Bank on December 31, 1989, did not disclose his debt to Boston Trade Bank or the full amount of his debt to First Service. His financial statement given to Boston Trade Bank on July 15, 1990 did not disclose any of the debt then owed to First Service. Nor, the district

---

**6.** The record was silent as to the beneficiaries of the Seaview Realty Trust.

**7.** Monthly statements of the Elio Family Trust's account show numerous other unexplained transactions, some in large amounts. After the trustee had been appointed and made its initial

report under seal to the court, the court noted on the record that the report showed substantial payments made by the trust which did not appear to be for the benefit of the beneficiaries, concluding that "if the FDIC had known about them, they would have emphatically used them in their earlier argument."

court reasonably inferred, had Elio told Attorney Davis of the extent of his substantial debt.

As to the proportion of Carmen Elio's property that he had transferred, the district court reasonably found that Elio's own statements on his previous financial statements were not credible, and that there was no evidence of any property other than that which had been transferred.

Given the evidentiary support for these several "badges of fraud," the district court reasonably concluded that the F.D.I.C. was likely to succeed on the merits of its claims against the two trusts.

The F.D.I.C. also sues FH Financial Services on its obligation under the $564,619.35 loan agreement executed July 1, 1991. There is sufficient evidence in the record to show that FH Financial Services undertook this obligation and is currently in default on it. Defendants do not claim otherwise and offer no defense. As a result, the district court was entitled to find that the F.D.I.C. would succeed on the merits of its claim against FH Financial Services.

### b. *Some showing of harm*

■ The record supports the district court's conclusion that the F.D.I.C. would be harmed if no trustee were appointed—specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired. There was evidence that assets of the Elio Family Trust had been expended on Carmen Elio's behalf, and that Elio had continued to enjoy the benefit of the assets transferred to the Seaview Realty Trust, thus permitting the inference that the assets of the trusts were still within Elio's control. The district court also reasonably found that the F.D.I.C. had been frustrated in its attempts to obtain discovery with respect to the assets of the two trusts and of FH Financial Services,[8] and with respect to the merits. The district court reasonably found that the information

previously provided by Carmen Elio himself as to their assets was not credible.

■ At the hearing on February 3, 1994, the court heard representations of counsel that FH Financial Services had once been owned by Carmen Elio, that it may subsequently have been transferred to one of Elio's children, that its present ownership was unknown, that its only known asset was a third mortgage on the Elios' home in Osterville, Massachusetts, that the current state of its business was unknown, and that the F.D.I.C. still sought discovery from it. The court extended the appointment of the trustee to FH Financial Services to verify its assets and ensure its compliance with the court's earlier order. As there was a void of information concerning FH Financial Service's business, assets and ownership, the court could reasonably have found that without the extension of the trustee to FH Financial Services, the F.D.I.C.'s ability to protect its rights and pursue its claim would be impaired.

We hold that there is ample evidence of harm in the record to satisfy the reduced standard required by 12 U.S.C. § 1821(d)(18) and (19).

### c. *Balance of harms*

■ Finally, the record supports the district court's conclusion that the balance of harms weighed in the F.D.I.C.'s favor. Defendants' contention that the appointment of a trustee would jeopardize the Elio Family Trust's license to sell securities was rejected by the district court and is not pursued on appeal. Defendants cite only the costs of trusteeship itself and the deprivation of ongoing control over their property as sources of harm. Though these harms are not negligible, the district court did not abuse its discretion in finding that they were outweighed by the potential harm to the F.D.I.C.'s ability to protect the assets of the failed banks. Moreover, because the likelihood of plaintiff's ulti-

---

8. In response to Carmen Elio's statement in an affidavit that the Florida property had been damaged in a hurricane and foreclosed upon, counsel for the F.D.I.C. stated, "My question is: Does the Seaview Realty Trust have other assets? What happened when it was foreclosed? Who foreclosed it? What were the proceeds of the fore-

closure? Was there an insurance policy payable? Was the loss payee the mortgagee if Hurricane Andrew damaged it? There are a lot of questions about the Seaview Realty Trust which aren't dissolved by that terse statement that the property was damaged by Hurricane Andrew and has been foreclosed."

mate success on the merits is great, "less weight is to be given to the defendant's prospective loss." *S.E.C. v. World Radio Mission, Inc.*, 544 F.2d 535, 541–42 (1st Cir. 1976).

### B. *Preliminary injunction against Elaine Elio*

■ The district court enjoined the defendants and those acting in concert with them from "selling, transferring, hypothecating, encumbering or otherwise alienating any assets or property," specifically allowing Carmen and Elaine Elio individually to pay their ordinary personal expenses up to $5,000 per month. The district court emphasized that he had found Elaine Elio to be "acting in concert" with Carmen Elio, that she would have been subject to the order even if not explicitly named, and that she was named in the order primarily to put her on notice and "minimize the risk that someone would inadvertently do something that will make them the subject for a motion for civil contempt by the F.D.I.C."

Defendants argue that the district court abused its discretion in granting a preliminary injunction against Elaine Elio individually, because (1) there was no support for a finding that she was acting in concert with Carmen Elio, and (2) the amount of the injunction should have been limited to the amount of the allegedly fraudulent transfer that she received from Carmen Elio.

■ But the evidence of Elaine Elio's involvement, was not limited merely to her receipt of $218,867 from Carmen Elio in September 1991. Elaine Elio was the trustee of the Elio Family Trust, which was the recipient of substantial transfers from Carmen Elio on at least three occasions, and which subsequently made two transfers to Carmen Elio or on his behalf. She was also a trustee of the Seaview Realty Trust. Seaview was the recipient of Florida residential property from Carmen Elio, which the court reasonably inferred could continue to be used by Carmen Elio after the transfer. In addition, Elaine Elio refused at her deposition to answer any questions about her involvement, asserting her Fifth Amendment privilege against self-incrimination. As this is a civil action, the district court was entitled to draw a negative inference from her refusal to testify. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976). We conclude there was reasonable support in the record for the district court's finding that Elaine Elio was acting in concert with Carmen Elio in his attempts to hinder, delay and defraud his creditors, and that a preliminary injunction was necessary to prevent further dissipation of Elio's assets.[9] *See* Fed. R.Civ.P. 65(d).

■ Nor was the scope of the injunction an abuse of discretion. Despite the district court's repeated invitation, Elaine Elio refused to provide information regarding the state and source of her assets, or to identify any assets which she had acquired independently from Carmen Elio. Defendants' assertion that Elaine Elio "may very well have" independent assets was unsupported by any evidence. The district court repeatedly offered to reconsider its order if such evidence were provided; none was. From her refusal to testify regarding the source of her assets, and from the other evidence of her acting in concert with Carmen Elio to defraud creditors, the court could have inferred a likelihood that there had been additional transfers in unknown amounts. Moreover, to enjoin her, in the abstract, from dissipating only those assets received from Carmen Elio would have been an ineffective directive subject to easy evasion, leaving the court with little ability to distinguish a valid expenditure from an invalid one. Given the failure of defendants to provide information on the basis of which the district court might have meaningfully modified its order, it was not an abuse of discretion to enjoin Elaine Elio from spending more than $5,000 per month. *See*

---

9. Defendants argue that the district court erroneously found that Elaine Elio was Carmen Elio's "alter ego," thereby inappropriately applying a principle of corporations to a relationship between two individuals. It is clear from the record, however, that the district court used the term "alter ego" not as a term of art but rather as synonymous with "acting in concert"; the court used the latter phrase several times, including in the December 27, 1993 order. Moreover, the court specifically clarified this issue, citing to Rule 65, on the record at the February 3, 1994 hearing.

*F.D.I.C. v. Faulkner,* 991 F.2d 262, 267 (5th Cir.1993); *F.S.L.I.C. v. Dixon,* 835 F.2d 554, 566 (5th Cir.1987).

### C. *Attachment on Elaine Elio's property*

The district court ordered an attachment in the amount of $5 million on the real property of Carmen and/or Elaine Elio in Barnstable County, Massachusetts. Echoing their arguments with respect to the preliminary injunction, defendants argue that the attachment, as it applies to Elaine Elio, was an abuse of discretion.

Unlike preliminary injunctions and receiverships, however, attachments are not among the interlocutory orders appealable under 28 U.S.C. § 1292(a). Defendants concede that interlocutory orders granting attachments are not ordinarily appealable, *see In re Unanue Casal,* 998 F.2d 28, 31–32 (1st Cir.1993); *Lowell Fruit Co. v. Alexander's Market, Inc.,* 842 F.2d 567, 568–70 (1st Cir.1988), but briefly argue that the rule should not apply here because the attachment is integrally related to the other orders, is based on the same findings of fact, and will not waste judicial resources. Defendants cite no statute or precedent in support of this argument, nor do defendants attempt to show that the attachment is appealable under the collateral order doctrine. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949)[10]. In these circumstances, we decline to review the attachment order. *Cf. In re Unanue Casal,* 998 F.2d at 31–32; *Lowell Fruit,* 842 F.2d at 568–70; *Sobol v. Heckler Congressional Comm.,* 709 F.2d 129, 130–32 (1st Cir.1983) (order dissolving attachment); *Midway Mfg. Co. v. Omni Video Games,*

*Inc.,* 668 F.2d 70, 71 (1st Cir.1981) (order vacating impoundment order).

*Affirmed.*

---

10. We question whether such a showing could be made. Under the collateral order doctrine, the order appealed from "must be a final order that presents an issue of law, not one of discretion, that is separable from the issues to be presented at trial, and that cannot await resolution until appeal from the final judgment because irreparable harm would be probable." *Midway Mfg. Co. v. Omni Video Games, Inc.,* 668 F.2d 70, 71 (1st Cir.1981). Here, the validity of the attachment order is by no means separable from the merits of the F.D.I.C.'s fraudulent conveyance claims, and it "may well involve only a fact-specific exercise of discretion rather than a controlling issue of law." *Bridge Constr. Corp. v. City of Berlin,* 705 F.2d 582, 583 (1st Cir.1983). In addition, given that the attachment of Carmen Elio's interest in this same property was not challenged, it appears unlikely that Elaine Elio will suffer any irreparable harm from the attachment on her interest.